***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the deputy commissioner hearing as
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and the named employer.
3. Valley Forge Insurance Company is the correctly named carrier on the risk.
4. The Plaintiff-employee's average weekly wage is $337.65.
5. The parties stipulated at the hearing to a packet of exhibits, including numerous medical records, to be submitted as evidence. That packet was later received along with the contentions from Plaintiff's counsel.
6. The parties further stipulated that the Plaintiff was involved in an accident at work on or about March 6, 1998. There is no stipulation that Plaintiff sustained injury as a result of that accident.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional
 FINDINGS OF FACT
1. On the date of the deputy commissioner hearing, plaintiff was 31 years of age. He quit school in the ninth grade and has not completed a GED or any further studies. Plaintiff began working for the Defendant in 1996.
2. On November 17, 1997, plaintiff suffered an admittedly compensable injury by accident arising out of and in the course and scope of his employment with defendant-employer when a barrel struck him, injuring his lower back.
3. On that same date, plaintiff went to the emergency room at Craven Regional Medical Center, where he had an orthopaedic examination and x-rays were taken of both the thoracic and lumbar spine. The x-rays were negative and Plaintiff was assessed with a contusion to his back and told to return if needed.
4. Later on that same day, November 17, 1997, plaintiff reported to New Bern Family Practice and complained of low back pain. Plaintiff was seen by Dr. Joseph Overby, a general practitioner, and diagnosed with a back contusion. Plaintiff was released to return to work effective November 18 at light duty with a ten pound lifting restriction. Plaintiff did return to work at light duty the next day.
5. On November 19, 1997, Plaintiff returned to New Bern Family Practice with ongoing complaints of low back pain. On this visit he was seen by Dr. J Phillip Mahaney, a general practitioner. He ordered x-rays of Plaintiff's lower back which were interpreted by Dr. Thomas W. Stohrer as normal. There was no evidence of fracture, misalignment, or soft tissue abnormality.
6. It appears that plaintiff was not satisfied with the foregoing medical assessments, and presented himself to Dr. Terry Kay, an orthopaedic specialist with East Carolina Orthopedics, on December 8, 1997. Upon reviewing x-rays and conducting a physical examination of plaintiff, Dr. Kay found no bone injuries and no evidence of nerve root irritability. Dr. Kay assessed plaintiff with acute lumbar strain and initiated conservative treatment through physical therapy and pain medication. Dr. Kay also wrote paintiff out of work for two weeks with a release to return to light duty with a ten pound lifting restriction at the end of that period.
7. On December 19, 1997, plaintiff returned to Dr. Kay with continued complaints of pain. Dr. Kay continued plaintiff's physical therapy at that time and wrote him out of work for an additional week.
8. On January 5, 1998, plaintiff returned to see Dr. Kay, and an MRI of plaintiff's lumbar spine was ordered. The MRI was done on January 7, 1998, Craven Regional Medical Center. This imaging study was interpreted by radiologist Dr. Garret Young and determined to be normal.
9. Plaintiff's claim for his November 17, 1997, injury was accepted pursuant to a Form 60 dated January 8, 1998. Plaintiff received temporary total disability benefits from November 17, 1997, through March 6, 1998, at a compensation rate of $220.42 per week based on a stipulated average weekly wage of $330.62.
10. On January 14, 1998, plaintiff returned to see Dr. Kay to discuss the findings of the MRI. At that time Dr. Kay advised plaintiff that the MRI was normal and that his condition should improve with physical therapy. Dr. Kay then placed plaintiff into a three-week physical therapy regimen with instructions to return to work upon completion of the program.
11. On February 5, 1998, plaintiff returned to see Dr. Kay. At this time, Dr. Kay referred plaintiff to Dr. Christopher Delaney, physiatrist, for a second opinion. Dr. Kay released plaintiff to return to sedentary duty at work with a 5 pound lifting restriction.
12. On February 9, 1998, plaintiff returned to Dr. Kay and stated that he was unable to perform sedentary work as released. Dr. Kay again wrote plaintiff out of work for one week and instructed him to return to light duty at the end of that time.
13. On February 26, 1998, paintiff presented to Dr. Christopher Delaney for a second opinion. Upon examination, Dr. Delaney found no objective evidence of any significant musculoskeletal or neurologic injury. Dr. Delaney also found at this time that plaintiff's examination was markedly inconsistent, suggesting profound symptom magnification.
14. On March 5, 1998, plaintiff was seen by Dr. Kay to discuss the findings of the second opinion. At this time, Dr. Kay released paintiff to return to work at full duty effective March 6, 1998.
15. Plaintiff returned to work with the employer on March 6, 1998. He testified that within an hour or two of starting work, he suffered another injury by accident when he fell while pushing a cart loaded with ice cream.
16. On March 9, 1998, Plaintiff returned to see Dr. Delaney with complaints of back pain from his alleged injury of March 6, 1998. At that time, Dr. Delaney determined that plaintiff either had a severe psychiatric problem or was malingering. Dr. Delaney released plaintiff to return to work without restriction.
17. Dr. Delaney was the only physician to have examined plaintiff both before and after his second alleged injury. Dr. Delaney was in the best position to compare plaintiff's condition to his previous injuries and formulate an opinion as to whether the March 6, 1998, accident caused any new or additional injury to plaintiff.
18. Dr. Delaney has performed numerous tests on plaintiff, including the Waddell's criteria, to rule out symptom magnification or malingering. The Waddell's criteria are designed to show inconsistent responses which may indicate underlying psycho-social causes for a patient's complaints. All of plaintiff's Waddell's signs were positive. Dr. Delaney testified that he performed an axial compression test, an en bloc rotation test, and a distracted straight leg raise test. All of these tests were positive for symptom magnification or malingering.
19. Dr. Delaney has found no evidence that plaintiff has any musculoskeletal or neurologic disorder. Plaintiff's pain complaints are not consistent with or supported by any objective medical findings. Plaintiff exhibited other inconsistent behavior by first claiming to need a wheelchair to get around and then later during the exam moving around the room unassisted.
20. Plaintiff showed other inconsistencies during Dr. Delaney's physical examination. Plaintiff contended that he had no upper body strength but then was able to pull himself up to a seated position using only his arms. Plaintiff contended that he lacked the muscle strength to resist the force of gravity to raise his legs, yet was able to lift the weight of his own body to stand and move about.
21. Dr. Delaney recommended no further diagnostic interventions and that physical therapy be discontinued. Dr. Delaney released plaintiff to work. Plaintiff then attempted to obtain another opinion from Dr. Kay regarding his alleged injuries of March 9, 1998, but Dr. Kay declined to see him.
22. Plaintiff failed to return to work as directed by Dr. Delaney. Plaintiff was contacted by David Briley, a representative of the employer and was informed that on March 10, 1998, he should return to work as instructed by his doctors unless he had a medical note to the contrary. Plaintiff never produced a doctor's note and never reported for work. Plaintiff was terminated for failing to return to work.
23. On March 19, 1998, plaintiff sought an additional medical opinion from Dr. Lee Whitehurst, an orthopaedist at Triangle Spine and Back Care Center. Dr. Whitehurst examined plaintiff and stated that he could find no physiological basis for plaintiff's complaints. Dr. Whitehurst also noted that plaintiff demonstrated muscle weakness, contrary to his well developed musculature.
24. On April 15, 1998, plaintiff saw Dr. Rudolph Maier, a neurologist. Dr. Maier deemed plaintiff able to return to work as well.
25. On September 21, 1998, plaintiff saw another neurologist, Dr. George Huffmon, for complaints of back pain. On examination, Dr. Huffmon could find nothing physically wrong with plaintiff and ordered nerve conduction studies and an EMG to rule out nerve injuries.
26. On September 24, 1998, Dr. Anna Bettendorf, physiatrist, performed nerve conduction studies and an EMG. As Dr. Bettendorf testified, those tests, which could not be influenced by a patient's conscious efforts, were essentially normal. Dr. Bettendorf further noted that plaintiff did not provide maximum effort in some aspects of the testing, a possible indication of symptom magnification.
27. Given Dr. Bettendorf's normal studies, Dr. Huffmon then ordered an MRI, CT, bone scan and discogram to rule out mechanical injuries that would support his pain complaints. On September 28, 1998, plaintiff had lumbar radiographs and a bone scan performed. Both of these tests were normal and revealed no abnormalities.
28. On February 17, 1999, plaintiff had a discogram and CT scan performed on his low back. Both of these tests were also normal and showed no evidence of any morphologic abnormality.
29. On February 17, 1999, plaintiff underwent an MRI of his low back. The results were normal and there was no evidence of neural compromise or lumbar stenosis.
30. On April 6, 1999, plaintiff was seen by Dr. Bradford Walters, neurosurgeon at the University of North Carolina at Chapel Hill. Dr. Walters noted that plaintiff's objective neurological exam was normal and that his imaging studies were also normal. Dr. Walters did not recommend any surgical treatment for plaintiff and did not arrange to see him further.
31. Plaintiff's continued complaints of intractable back pain are not supported by any objective medical examinations or testing. Plaintiff's complaints of pain and claims of ongoing disability are not deemed credible or persuasive.
32. Plaintiff has a history of depression that pre-dates his injury. This history includes a failed suicide attempt in October 1997 when Plaintiff shot himself in the head with a handgun.
33. Plaintiff testified at the hearing that his depression resulted from the death of his brother and his perceived failure to "be there for him." No doctor or psychiatrist testified that plaintiff's depression was related to an on-the-job injury. Dr. Bettendorf testified that she did not ask plaintiff about any psychological or psychiatric problems and that plaintiff did not offer any information to raise the question of a psychological injury. Dr. Bettendorf performed an examination and EMG studies which showed normal nerve and muscle function in the face of unfounded complaints of muscle weakness. Dr. Bettendorf explained that the difference between the patient's perception and his physical condition may be due to depression. Dr. Bettendorf expressed that plaintiff's preexisting depression could be the cause of his perception of pain and weakness when his medical testing failed to present an injury that would justify such complaints. Similarly, Dr. Delaney reported that he could find no organic explanation for plaintiff's symptoms and that plaintiff had numerous positive Waddell signs, which may indicate a psychiatric diagnosis such as conversion disorder or somatization and which may explain why a patient is perceiving or demonstrating disability or disease which he really does not have. The medical records include records from Neuse Center for Mental Health, Developmental Disabilities, and Substance Abuse Services. These records indicate that plaintiff exhibited signs of depression which were not significantly improved with medications. The history presented in the mental health records appeared to come from plaintiff's wife and indicated complaint regarding workers' compensation benefits and with pain. Only after several months did the treating psychiatrist become aware that plaintiff had depression prior to his workplace injuries and that he previously had attempted suicide. Other than reporting plaintiff's history, the psychiatric records do not provide a medical opinion concerning the cause of plaintiff's depression or whether it was augmented by plaintiff's injuries at work. Therefore, based on the greater weight of the competent evidence, the Full Commission finds that plaintiff had preexisting depression which caused him to overstate his workplace injuries. The competent evidence does not establish that plaintiff has depression or other mental illness because of his injuries at work.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. (I.C. No. 801638) On or about November 17, 1997, Plaintiff suffered an injury by accident arising out of and in the course of his employment with the defendant employer. This claim was accepted as compensable, and plaintiff received all appropriate workers' compensation benefits for that injury by accident. G.S. § 97-2(6) et seq.
2. (I.C. No. 824147) Plaintiff has failed to prove that on or about March 6, 1998, he sustained a compensable injury by accident. Plaintiff has the burden of proving that the medical conditions of which he complains resulted from an accident arising out of and in the course of his employment. The evidence fails to establish that he sustained any injuries as a result of this accident such as to make this claim compensable or to establish disability. G.S. § 97-2(6), § 97-29, § 97-30; Henry v. A.C. Lawrence Leather Company, 231 N.C. 477
(1950).
3. Plaintiff has failed to prove by the greater weight of the credible evidence that, on or about March 6, 1998, he sustained a change of condition, new condition, or aggravation or exacerbation of a preexisting condition related to the November 17, 1997, compensable injury by accident. G.S. § 97-2(6).
4. Plaintiff's claim for any additional benefits based upon a new accident or aggravation of his preexisting condition must be denied under the provisions of the North Carolina Workers' Compensation Act. G.S. § 97-2(6).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits is DENIED.
2. Each side shall bear its own costs, except that the defendants shall pay the expert witness fees previously approved.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER